Amy K. Anderson
Texas Bar. No. 24077064
JONES WALKER LLP
5960 Berkshire Ln, Floor 6
Dallas, Texas 75225
Tel:    (214) 459-9682
Fax:    (713) 437-1810
Email: aanderson@joneswalker.com

Mark Mintz
Texas Bar No. 24124555
811 Main Street, Suite 2900
Houston, Texas 77002
Tel:    (713) 437-1800
Fax:    (713) 437-1810
Email: mmintz@joneswalker.com

James D. Weinberger (PHV *forthcoming*)
Parker C. Eudy (PHV *forthcoming*)
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
151 West 42nd Street, 17th Floor
New York, NY 10036
Tel:    (212) 813-5900
Fax:    (212)813-5901
Email: jweinberger@fzlz.com
            peudy@fzlz.com

***Attorneys for McIlhenny Company***

## UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| STOLI GROUP (USA), LLC | Case No. 24-80146-swe11 |
| MCILHENNY COMPANY, | Adversary Proc. No. 26-8001-swe |
| *Plaintiff*, | |
| v. | |
| LOUISIANA SPIRITS, LLC AND STOLI GROUP (USA), LLC, | |
| *Defendants*. | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iv

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ........................................................................................2

I.      McIlhenny, TABASCO® Brand Pepper Sauce, and the TABASCO® Trade Dress ..........2

II.     Defendants' Conduct and the Infringing Trade Dress ........................................5

III.    Harm to McIlhenny ...............................................................................7

ARGUMENT ........................................................................................................7

I.      McIlhenny is Likely to Succeed on the Merits .................................................8

        A.      Trade Dress Infringement and Unfair Competition Claims....................................8

                1.      The TABASCO® Trade Dress is Valid and Protectable............................8

                2.      Defendants' Products Are Likely to Cause Confusion .............................12

                        a. The TABASCO® Trade Dress is Strong ................................................12

                        b. The Parties' Trade Dresses Are Almost Identical..................................13

                        c. The Relevant Products Are Identical .....................................................14

                        d. The Parties Have Overlapping Trade and Marketing Channels ...........15

                        e. Defendants Acted with Bad Faith Intent...............................................16

                        f. Consumers Exercise a Low Degree of Care ..........................................18

                        g. Confusion Exists Despite Defendants' Lack of Sales...........................18

                        h. Weighing the Digits ..............................................................................19

        B.      Dilution Claims................................................................................19

II.     McIlhenny Will Suffer Irreparable Harm Absent an Injunction........................................21

III.    The Irreparable Harm to McIlhenny Far Outweighs Any Harm to Defendants ................22

IV.    A Preliminary Injunction Would Serve the Public Interest ................................................24

CONCLUSION ....................................................................................................................................24

# TABLE OF AUTHORITIES

## Cases

*ADT, LLC v. Capital Connect, Inc.*,
   145 F. Supp. 3d 671 (N.D. Tex. 2015) .......................................................................23, 24

*Advantage Rent-A-Car, Inc. v. Enterprise Rent-A-Car, Co.*,
   238 F.3d 378 (5th Cir. 2001) ................................................................................................19

*Amazing Spaces, Inc. v. Metro Mini Storage*,
   608 F.3d 225 (5th Cir. 2010) ..................................................................................................9

*American Rice, Inc. v. Arkansas Rice Growers Cooperative Association*,
   532 F. Supp. 1376 (S.D. Tex. 1982) ....................................................................................23

*American Rice, Inc. v. Producers Rice Mill, Inc.*,
   518 F.3d 321 (5th Cir. 2008) ................................................................................................12

*Amstar Corp. v. Domino's Pizza, Inc.*,
   615 F.2d 252 (5th Cir. 1980) .........................................................................................16, 18

*AutoZone IP LLC v. Awad*,
   17-CV-13107, 2018 WL 6591910 (E.D. La. Dec. 12, 2018) ................................................19

*Beatriz Ball, L.L.C. v. Barbagallo Co.*,
   40 F.4th 308 (5th Cir. 2022) ..................................................................................................8

*Beef/Eater Restaurants, Inc. v. James Burrough, Ltd.*,
   398 F.2d 637 (5th Cir. 1968) ................................................................................................15

*Board of Regents of the University of Houston System v. Houston College
of Law, Inc.*, 214 F. Supp. 3d 573 (S.D. Tex. 2016) ................................................................13

*Board of Supervisors for Louisiana State University Agricultural & Mechanical College v.
Smack Apparel Co.*, 550 F.3d 465 (5th Cir. 2008) ......................................................8, 13, 18

*Brock Services, L.L.C. v. Rogillio*,
   936 F.3d 290 (5th Cir. 2019) ..................................................................................................7

*Cathey Associates, Inc. v. Beougher*,
   95 F. Supp. 2d 643 (N.D. Tex. 2000) ....................................................................................8

*Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.*,
   659 F.2d 695 (5th Cir. 1981) ................................................................................................10

*Denbra IP Holdings, LLC v. Thornton*,
   521 F. Supp. 3d 677 (E.D. Tex. Feb. 22, 2021)........................................................ 14-15, 22

*Elvis Presley Enterprises, Inc. v. Capece*,
   141 F.3d 188 (5th Cir. 1998) ........................................................................................ *passim*

*Emerald City Management, L.L.C. v. Kahn*,
   624 F. App'x 223 (5th Cir. 2015) ...................................................................22

*Engineering Dynamics, Inc. v. Structural Software, Inc.*,
   26 F.3d 1335 (5th Cir. 1994) .......................................................................8

*Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*,
   289 F.3d 351 (5th Cir. 2002) .......................................................................11

*Exxon Corp. v. Texas Motor Exchange of Houston, Inc.*,
   628 F.2d 500 (5th Cir. 1980) ...............................................................13, 14

*Firefly Digital Inc. v. Google Inc.*,
   817 F. Supp. 2d 846 (W.D. La. 2011).............................................................19

*Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*,
   982 F.3d 280 (5th Cir. 2020) .......................................................................12

*Gruma Corp. v. Mexican Restaurants, Inc.*,
   497 F. App'x 392 (5th Cir. 2012) .................................................................15

*Jones v. American Council on Exercise*,
   245 F. Supp. 3d 853 (S.D. Tex. 2017) ......................................................10, 11

*Laboratorios Pisa S.A. De C.V. v. PepsiCo, Inc.*,
   21-CV-0062, 2021 WL 783854 (S.D. Tex. Feb. 27, 2021) ....................................9

*Lady Primrose's, Inc. v. After Hours Bath Products, Inc.*,
   211 F.3d 125, 2000 WL 309967 (5th Cir. Mar. 6, 2000)...................................9, 17

*Luv n' Care v. Laurain*,
   16-CV-0777 (TAD)(JPM), 2021 WL 7907283 (W.D. La. Mar. 29, 2021) ............... 8-9

*Mighty Mug, Inc. v. 28ceramics*,
   22-CV-0100 (RP), 2022 WL 22870172 (W.D. Tex. Mar. 8, 2022) .......................22

*National Business Forms & Printing, Inc. v. Ford Motor Co.*,
   671 F.3d 526 (5th Cir. 2012) .......................................................................19

*Oreck Corp. v. U.S. Floor Systems, Inc.*,
   803 F.2d 166 (5th Cir. 1986) .......................................................................17

*OTR Wheel Engineering, Inc. v. West Worldwide Services, Inc.*,
   602 F. App'x 669 (9th Cir. 2015) ...................................................................9

*Pebble Beach Co. v. Tour 18 I Ltd.*,
   155 F.3d 526 (5th Cir. 1998) ..............................................................8, 10, 11

*Pengu Swim School, LLC v. Blue Legend, LLC*,
   21-CV-1525, 2023 WL 3044607 (S.D. Tex. Apr. 21, 2023)...............................11

*Perry v. H. J. Heinz Co. Brands, L.L.C.*,
   994 F.3d 466 (5th Cir. 2021) .......................................................................8

*Precision Tune, Inc. v. Tune-A-Car, Inc.*,
  611 F. Supp. 360 (W.D. La. 1984)......................................................................................17

*Preservation Alliance of New Orleans, Inc. v. Gressett*,
  05-CV-1337 (HGB)(SS), 2005 WL 8173931 (E.D. La. May 9, 2005) ..................................20

*Quantum Fitness Corp. v. Quantum LifeStyle Centers, L.L.C.*,
  83 F. Supp. 2d 810 (S.D. Tex. 1999)..............................................................................13, 22

*RE/MAX International, Inc. v. Trendsetter Realty, LLC*,
  655 F. Supp. 2d 679 (S.D. Tex. 2009) ................................................................................14

*Realogy Holdings Corp. v. Jongebloed*,
  957 F.3d 523 (5th Cir. 2020) ................................................................................................7

*S & H Industries, Inc. v. Selander*,  ....................................................................................8
  932 F. Supp. 2d 754 (N.D. Tex. 2013)

*Savage Tavern, Inc. v. Signature Stag, LLC*,
  589 F. Supp. 3d 624 (N.D. Tex. 2022)..........................................................................18, 24

*Scott Fetzer Co. v. House of Vacuums Inc.*,
  381 F.3d 477 (5th Cir. 2004) .....................................................................................8, 16, 19

*Seabrook Foods, Inc. v. Bar-Well Foods Ltd.*,
  568 F.2d 1342 (C.C.P.A. 1977) ............................................................................................9

*Streamline Production Systems, Inc. v. Streamline Manufacturing, Inc.*,
  851 F.3d 440 (5th Cir. 2017) .....................................................................................12, 16, 18

*Sueros Y Bebidas Rehidratantes, S.A. de D.V. v. Indus Enterprises, LLC*,
  690 F. Supp. 3d 745 (S.D. Tex. 2023) ...........................................................................17, 18

*Sun-Fun Products, Inc. v. Suntan Research & Development Inc.*,
  656 F.2d 186 (5th Cir. 1981) ..............................................................................................17

*Sunbeam Products, Inc. v. West Bend Co.*,
  123 F.3d 246 (5th Cir. 1997) ..............................................................................................10

*T-Mobile US, Inc. v. AIO Wireless LLC*,
  991 F. Supp. 2d 888 (S.D. Tex. 2014) ...........................................................................12, 13

*Tapatio Foods, LLC v. Rodriguez*,
  19-CV-0335 (DAD)(SKO), 2019 WL 6168416 (E.D. Cal. Nov. 20, 2019)...........................18

*Texas Tech University v. Spiegelberg*,
  461 F. Supp. 2d 510 (N.D. Tex. 2006) ...............................................................................21

*Total Rebuild Inc v. Streamline Hose & Fittings Inc.*,
  15-CV-1172 (RFD)(CBW), 2015 WL 9237112 (W.D. La. Dec. 16, 2015) ...........................8

*TrafFix Devices, Inc. v. Marketing Displays, Inc.*,
  532 U.S. 23 (2001) ................................................................................................8, 10, 11

*Trojan Battery Co. v. Trojan EV, LLC*,
   21-CV-3075, 2024 WL 1331783 (S.D. Tex. Mar. 28, 2024) ...................................17

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
   505 U.S. 763 (1992) ...................................................................................................9

*Viahart, LLC v. Chickadee Business Solutions, LLC*,
   19-CV-0406 (JCB), 2021 WL 6333033 (E.D. Tex. July 2, 2021) ..........................21

*VIP Products LLC v. Jack Daniel's Properties Inc.*,
   14-CV-2057 (SMM), 2025 WL 275909 (D. Ariz. Jan. 23, 2025) ...........................15

*Waterloo Sparkling Water Corp. v. Treaty Oak Brewing & Distilling Co.*,
   21-CV-0161 (RP), 2021 WL 5568159 (W.D. Tex. Nov. 28, 2021) ..................16, 17

*Wearable Shoe Tree, LLC v. Does 1-601*,
   24-CV-0334 (SDJ), 2024 WL 3317749 (E.D. Tex. July 3, 2024)............................22

*Whirlpool Corp. v. Shenzhen Sanlida Electrical Technology Co.*,
   80 F.4th 536 (5th Cir. 2023) ...................................................................................11

*Xtreme Lashes, LLC v. Xtended Beauty, Inc.*,
   576 F.3d 221 (5th Cir. 2009) ...........................................................................16, 18

**Statutes**

15 U.S.C. § 1052.............................................................................................................10

15 U.S.C. § 1116.............................................................................................................21

15 U.S.C. § 1125........................................................................................................19, 20

La. Rev. Stat. Ann. § 51:223.1.........................................................................................19

La. Rev. Stat. Ann. § 51:1401 *et seq.* .............................................................................8

**Rules**

Federal Rule of Bankruptcy 7065 ......................................................................................2

Federal Rule of Civil Procedure 65 ...................................................................................2

## PRELIMINARY STATEMENT

Plaintiff McIlhenny Company ("McIlhenny") is the owner of the TABASCO® brand, including its iconic pepper sauce ("TABASCO® Brand Pepper Sauce"), one of the most famous food products in the history of the United States. Edmund McIlhenny developed TABASCO® Brand Pepper Sauce in the 1860s, and his descendants later incorporated McIlhenny, which has remained family-owned since its founding. McIlhenny is steeped in tradition, and the packaging of the TABASCO® Brand Pepper Sauce bottle (the "TABASCO® Trade Dress") has remained unchanged since 1927. Over the past century, McIlhenny has invested hundreds of millions of dollars into marketing the TABASCO® Trade Dress, which has become instantly recognizable to consumers throughout and culturally iconic in the United States and is the subject of several federal trademark registrations at the United States Patent & Trademark Office. In addition, to capitalize on the commercial success of TABASCO® Brand Pepper Sauce, McIlhenny has licensed the TABASCO® Trade Dress to third parties for various co-branded products ranging from food and spirits to clothing and event slot machines.

In late 2024, McIlhenny and defendant Louisiana Spirits, LLC ("Louisiana Spirits") and defendant/reorganized debtor Stoli Group (USA), LLC ("Stoli" and, together with Louisiana Spirits, "Defendants") held preliminary discussions about a potential collaboration regarding a vodka product, but McIlhenny ultimately decided to go in a different direction and terminated discussions in December 2024. A year later, Defendants announced their own pepper-flavored vodka ("Defendants' Product"), which they claim will become available for sale within days. Publicly available advertising for Defendants' Product reveals that its packaging (the "Infringing Trade Dress") is nearly identical to the TABASCO® Trade Dress.

Similarity between the Infringing Trade Dress and the TABASCO® Trade Dress is no coincidence, given the notoriety of TABASCO® Brand Pepper Sauce and the parties' prior negotiations. Indeed, the Infringing Trade Dress uses the design Defendants proposed to McIlhenny for their co-branded product without the TABASCO® name. But McIlhenny never authorized Defendants to use the TABASCO® Trade Dress, and the Infringing Trade Dress is likely to cause confusion among consumers about the source or sponsorship of Defendants' Product, and/or about the affiliation between it and McIlhenny. It is also likely to dilute the ability of the famous TABASCO® Trade Dress to identify McIlhenny exclusively. Accordingly, McIlhenny seeks a preliminary injunction pursuant to Federal Rule of Bankruptcy 7065 and Federal Rule of Civil Procedure 65(a) to prevent the irreparable harm caused by Defendants' conduct.

## STATEMENT OF FACTS

### I.    <u>McIlhenny, TABASCO® Brand Pepper Sauce, and the TABASCO® Trade Dress</u>

The McIlhenny family has offered TABASCO® Brand Pepper Sauce since 1868. Declaration of Kate Neuhaus in Support of Plaintiff's Motion for a Preliminary Injunction ("Neuhaus Decl."), ¶¶ 4-6. McIlhenny has remained a family-owned business for over five generations, with its headquarters on Avery Island in Louisiana. *Id.* ¶ 5. The current bottle packaging and labeling of TABASCO® Brand Pepper Sauce has been offered in the TABASCO® Trade Dress since 1927, comprised of the following elements: (i) a clear cylindrical bottle with a narrow neck, (ii) a red cap, (iii) a green label covering the circumference of the narrow neck, (iv) and a diamond-shaped label with broken concentric circles in the middle of the thicker portion of the bottle with the words TABASCO BRAND PEPPER SAUCE McILHENNY CO. AVERY ISLAND LA in green and red sans serif font, all as shown here:



*Id.* ¶ 7 & Ex. A. McIlhenny owns incontestable federal trademark registrations for the TABASCO® Trade Dress, U.S. Reg. Nos. 805670, 805671, 1916568 and 3015104. *Id.* ¶ 33 & Ex. K.

Beloved by consumers, TABASCO® Brand Pepper Sauce is sold online and in retail stores throughout the country and is used by restaurants and bars as the pepper sauce of choice. *Id.* ¶ 21. The U.S. sales for TABASCO® Brand Pepper Sauce are enormous, with over 1.5 *billion* units solid in the last 30 years. *Id.* In the last 10 years, McIlhenny's annual U.S. sales of TABASCO® Brand Pepper Sauce exceeded $85 *million* each year. *Id.* ¶ 22. As a result, TABASCO® Brand Pepper Sauce enjoys significant market share in the hot sauce market; each year from 2019 to 2025, the TABASCO® brand (of which TABASCO® Brand Pepper Sauce is a major component) has ranked as the second or third bestselling hot sauce brand in the United States by revenue amongst hundreds of competitors. *Id.* ¶ 23.

Use of the TABASCO® Trade Dress is not limited to hot sauce, and U.S. consumers have become accustomed to seeing a wide variety of officially licensed non-hot sauce products bearing the TABASCO® Trade Dress. *Id.* ¶¶ 24-28 & Exs. H, I. Over the years, McIlhenny has partnered with other companies to offer co-branded products, including but not limited to salad dressing, steak sauce, snack products, whiskey, apparel, and slot machines. *See id.* ¶ 24. The majority of

these products incorporate elements of the TABASCO® Trade Dress, and all of them are sold under license from McIlhenny, generating significant exposure and additional revenue for the company. *Id.* ¶ 25. Relevant to this dispute, McIlhenny has licensed the TABASCO® Trade Dress to alcoholic beverage brands such as GEORGE DICKEL and ABSOLUT in connection with co-branded, pepper-flavored alcohol products, and an ABSOLUT x TABASCO brand vodka product (the "ABSOLUT x TABASCO Brand Product") was released this week, on January 28, 2026, pursuant to a licensing agreement that McIlhenny and Absolut Company entered into, effective May 30, 2025. *Id.* ¶ 26.

McIlhenny has invested hundreds of millions of dollars into advertising and promoting TABASCO® Brand Pepper Sauce products using imagery that focuses on the TABASCO® Trade Dress. *Id.* ¶ 10. Such advertising covers a wide range of media, from traditional print publications, to television and podcasts, to digital media via online advertisements and dedicated social media accounts. *Id.* ¶ 11-13 & Ex. B. McIlhenny also maintains a website and robust social media channels for TABASCO® Brand Pepper Sauce, all of which prominently feature imagery of the TABASCO® Trade Dress. *Id.* ¶¶ 14-15 & Ex. C. McIlhenny's Facebook, TikTok, YouTube, and Instagram accounts cumulatively reach over 4,300,000 followers and subscribers. *Id.* ¶¶ 16-19 & Exs. D-G.

McIlhenny's extensive advertising is unrivaled in the hot sauce industry. For example, McIlhenny created and placed TV commercials featuring the TABASCO® Trade Dress during the 1998 and 2005 Super Bowls, which reached hundreds of millions of U.S. consumers. *Id.* ¶ 13. In addition, TABASCO® Brand Pepper Sauce has been prominently used at the White House for dinners with multiple U.S. presidents, by astronauts on the International Space Station, and by countless celebrities (such as Beyoncé, Martha Stewart, and Jimmy Fallon) and famous chefs and

bartenders online or on television. *Id.* ¶ 20. Appearing in numerous blockbuster films throughout the decades, the TABASCO® Trade Dress has become culturally iconic as a result of McIlhenny's advertising efforts and enormous sales. *Id.* ¶¶ 29-31 & Ex. J.

The combination of advertising, sales, press coverage, and cultural usage of the TABASCO® Trade Dress has transformed TABASCO® Brand Pepper Sauce into a household name that immediately conjures up an image of the TABASCO® Trade Dress in the minds of millions of consumers throughout the United States. *Id.* ¶¶ 31-32. Consequently, ordinary consumers recognize the TABASCO® Trade Dress as associated exclusively with McIlhenny, and the TABASCO® Trade Dress represents enormous goodwill to the company. *Id.*

## II.   <u>Defendants' Conduct and the Infringing Trade Dress</u>

On November 1, 2024, Louisiana Spirits contacted McIlhenny to express interest in a potential collaboration between Defendants' STOLI brand and McIlhenny's TABASCO® brand. *Id.* ¶ 35. Over the next several weeks, the parties exchanged email correspondence and confidentiality agreement drafts (which were never fully executed). *Id.* ¶ 36. McIlhenny was concurrently discussing a potential collaboration with Absolut Company for a vodka product, which ultimately became the ABSOLUT x TABASCO Brand Product. *Id.* ¶¶ 26, 37. After learning about Stoli's bankruptcy, McIlhenny advised Defendants on December 10, 2024 that it was in discussions with other spirit brands about potential collaborations and was no longer interested in continuing discussions. *Id.* ¶ 38.

The next day, without acknowledging McIlhenny's email terminating such discussions, Defendants sent McIlhenny via email two mockups of their proposed pepper-flavored vodka product. *Id.* ¶ 39. McIlhenny did not acknowledge Defendants' email or the mockups, and the parties did not engage in further discussions. *Id.*

Nearly a year later, in December 2025, McIlhenny learned that Defendants intended to launch their own pepper-flavored STOLI vodka in January 2026 ("Defendants' Product") in packaging that is almost identical to the TABASCO® Trade Dress and the mockups that Defendants sent McIlhenny in December 2024 (the "Infringing Trade Dress"). *Id.* ¶ 40. The TABASCO® Trade Dress and the Infringing Trade Dress are shown side-by-side below:





TABASCO® Trade Dress                          Infringing Trade Dress

*Id.* The Infringing Trade Dress copies the design of the TABASCO® Trade Dress, using the same bottle shape, color scheme, green neck label, and red cap, and it uses a broken concentric circle design in the center of the bottle with green and red sans serif font. *Id.* ¶¶ 41-42.

On December 15, 2025, Defendants issued a press release announcing Defendants' Product, which included images of the Infringing Trade Dress and promoted it as being "produced and bottled in Louisiana" (like TABASCO® Brand Pepper Sauce); press coverage from several trade industry publications soon followed. *Id.* ¶¶ 40, 43. Defendants have also promoted Defendants' Product and the Infringing Trade Dress in posts on Instagram, at least one of which was made after the Complaint in this action was filed. *Id.* ¶¶ 44-46. Comments on Defendants' posts have pointed out the similarity between the parties' trade dress. *Id.* ¶ 44. Defendants' Product

is not yet available for sale, but Defendants' marketing indicates that it will become so any day. *Id.* ¶¶ 40, 50.

## III.   <u>Harm to McIlhenny</u>

McIlhenny will suffer, and has already suffered, harm if Defendants are permitted to continue using the Infringing Trade Dress. *Id.* ¶¶ 54-56. First, consumers will associate Defendants' Product with McIlhenny and the TABASCO® Trade Dress when there is no such relationship. *Id.* ¶ 55. McIlhenny has no control over the quality of Defendants' Product, and Stoli's pending bankruptcy will negatively impact consumer views of Defendants' Product. *Id.* Second, McIlhenny's contemporaneous launch of the licensed ABSOLUT x TABASCO Brand Product will be threatened, as the simultaneous offering of two vodka products perceived to be made with TABASCO® Brand Pepper Sauce would negatively impact McIlhenny's licensed product with Absolut Company. *Id.* ¶ 56. Moreover, Defendants' Product could severely damage McIlhenny's relationships with Absolut Company and other existing licensees, as well as destroy McIlhenny's ability to license the TABASCO® Trade Dress in the future. *Id.*

## ARGUMENT

To obtain a preliminary injunction, McIlhenny "must show (1) a substantial likelihood of success on the merits, (2) irreparable injury if the injunction is not granted, (3) that the injury outweighs any harm to the other party, and (4) that granting the injunction will not disserve the public interest." *Realogy Holdings Corp. v. Jongebloed*, 957 F.3d 523, 529-30 (5th Cir. 2020) (quoting *Brock Servs., L.L.C. v. Rogillio*, 936 F.3d 290, 296 (5th Cir. 2019)). As set forth below, McIlhenny meets each of these requirements.

## I.    McIlhenny is Likely to Succeed on the Merits

### A.    Trade Dress Infringement and Unfair Competition Claims

To establish trade dress infringement under the Lanham Act, a plaintiff "must prove that: (1) its trade dress qualifies for protection; and (2) the trade dress has been infringed by demonstrating a likelihood of confusion in the minds of potential consumers." *Beatriz Ball, L.L.C. v. Barbagallo Co.*, 40 F.4th 308, 317 (5th Cir. 2022) (citation omitted).[1] Trade dress qualifies for protection if "it is either inherently distinctive or has acquired secondary meaning, and [if it] is not functional." *Cathey Assocs., Inc. v. Beougher*, 95 F. Supp. 2d 643, 654 (N.D. Tex. 2000).

### 1.    The TABASCO® Trade Dress is Valid and Protectable

Because the TABASCO® Trade Dress is protected by several incontestable federal trademark registrations, *see* Neuhaus Decl. ¶ 33, it is conclusively valid for the goods and services listed therein. *See Perry v. H. J. Heinz Co. Brands, L.L.C.*, 994 F.3d 466, 471 (5th Cir. 2021) ("Once a mark becomes incontestable, its federal registration constitutes conclusive evidence of its validity."). This "extends to the distinctiveness of the registered mark and also its nonfunctionality." *Luv n' Care v. Laurain*, 16-CV-0777 (TAD)(JPM), 2021 WL 7907283, at *14

---

[1] Under the Lanham Act, "[t]he same tests apply to both trademarks and trade dress to determine whether they are protectible and whether they have been infringed." *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 536 (5th Cir. 1998), *abrogated on other grounds by TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23 (2001). Moreover, "[u]nfair competition claims under the Lanham Act are governed by the same standard as those for trademark infringement." *S & H Indus., Inc. v. Selander*, 932 F. Supp. 2d 754, 762 (N.D. Tex. 2013) (citing *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 483 (5th Cir. 2004)). The same test applies to unfair competition claims under the Louisiana Unfair Trade Practices Act, La. Rev. Stat. Ann. § 51:1401 *et seq. See Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 490 n.130 (5th Cir. 2008); *Total Rebuild Inc v. Streamline Hose & Fittings Inc.*, 15-CV-1172 (RFD)(CBW), 2015 WL 9237112, at *3-4 (W.D. La. Dec. 16, 2015) (citing *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335,1350 (5th Cir. 1994)).

(W.D. La. Mar. 29, 2021); *see also OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 602 F. App'x 669, 671 (9th Cir. 2015) (same).

Beyond McIlhenny's registrations, the TABASCO® Trade Dress is distinctive and nonfunctional. Trade dress is distinctive "if it *either* (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992) (emphasis in original). The TABASCO® Trade Dress meets both standards. Because product packaging options are "virtually endless," "the Fifth Circuit [has] recognized that product packaging has a tendency to be inherently distinctive." *Laboratorios Pisa S.A. De C.V. v. PepsiCo, Inc.*, 21-CV-0062, 2021 WL 783854, at *2 (S.D. Tex. Feb. 27, 2021) (citation omitted). In determining distinctiveness, the Fifth Circuit applies *Seabrook Foods, Inc. v. Bar-Well Foods Ltd.*, to assess whether a trade dress is (1) common or basic; (2) unique or unusual in a particular field; (3) a mere refinement of a commonly adopted and well-known form of ornamentation for a particular class of goods; or (4) capable of creating a commercial impression distinct from any accompanying words. 568 F.2d 1342, 1344 (C.C.P.A. 1977). *See Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 240-47 (5th Cir. 2010) (applying *Seabrook* factors to "inherently distinctive" inquiry).

Here, the TABASCO® Trade Dress consists of a unique combination of elements. This trade dress is "inherently distinctive because the particular arbitrary combination of colors, raw materials . . . , and creative packaging . . . serve[s] to identify a particular source," *i.e.*, McIlhenny and its TABASCO® Brand Pepper Sauce. *Lady Primrose's, Inc. v. After Hours Bath Prods., Inc.*, 211 F.3d 125, 2000 WL 309967, at *2 (5th Cir. Mar. 6, 2000) (internal quotation marks omitted). The combination of elements embodied by the TABASCO® Trade Dress is neither common nor basic, and it differentiates the TABASCO® Trade Dress from competitors' products. Neuhaus

Decl. ¶¶ 8-9. Furthermore, even without the words that appear on the TABASCO® Trade Dress, the remaining "combination of features creates a distinctive visual impression, identifying the source of the product." *Sunbeam Prods., Inc. v. W. Bend Co.*, 123 F.3d 246, 251 n.3 (5th Cir. 1997), *abrogated on other grounds by TrafFix Devices*, 532 U.S. 23; *see also* Neuhaus Decl. ¶ 8.

Although secondary meaning is not required where trade dress is inherently distinctive, *see Chevron Chem. Co. v. Voluntary Purchasing Grps., Inc.*, 659 F.2d 695, 702 (5th Cir. 1981), here the TABASCO® Trade Dress has acquired distinctiveness through secondary meaning in any event. To evaluate secondary meaning, courts in the Fifth Circuit consider:

> (1) length and manner of use of the mark or trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the trade dress.

*Pebble Beach*, 155 F.3d at 541. These factors weigh decisively in McIlhenny's favor. McIlhenny has exclusive ownership rights to use the TABASCO® Trade Dress and has used it for nearly one hundred years. Neuhaus Decl. ¶ 4; *see Jones v. Am. Council on Exercise*, 245 F. Supp. 3d 853, 862 (S.D. Tex. 2017) (finding that the plaintiff's use of its trademark "for more than twenty years" is "significant" and weighs in favor of secondary meaning); 15 U.S.C. § 1052(f) (five years of substantially exclusive and continuous use as a mark is *prima facie* evidence of secondary meaning). The volume of McIlhenny's sales of TABASCO® Brand Pepper Sauce is staggering, averaging U.S. sales of more than $85 *million* per year over the past 10 years. Neuhaus Decl. ¶¶ 21-22. Moreover, McIlhenny has invested hundreds of millions of dollars into promoting products bearing the TABASCO® Trade Dress through various channels, from advertising on social media and popular websites, to television and podcasts, to magazines and newspapers, to participating in high-profile food industry events. *See id.* ¶¶ 10-11. In addition, Defendants' awareness of the TABASCO® Trade Dress when they chose the Infringing Trade Dress weighs

in favor of secondary meaning. *See Jones*, 245 F. Supp. 3d at 862 (finding secondary meaning where defendant was "aware of [plaintiff's trademark] and then later chose to use the same name in the same industry for a similar [offering]"); Neuhaus Decl. ¶ 53. Accordingly, the TABASCO® Trade Dress has acquired distinctiveness through secondary meaning such that the trade dress has become "uniquely associated" with McIlhenny. *Pebble Beach*, 155 F.3d at 536.

The TABASCO® Trade Dress is also nonfunctional. Trade dress is functional: (1) "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article"; or (2) if "exclusive use" of the trade dress "would put competitors at a significant non-reputation-related disadvantage." *Whirlpool Corp. v. Shenzhen Sanlida Elec. Tech. Co.*, 80 F.4th 536, 544 (5th Cir. 2023) (citations omitted). Here, the TABASCO® Trade Dress is non-functional because none of the features comprising the trade dress are the "reason [McIlhenny's products] work[ ]." *Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351, 355 (5th Cir. 2002). The TABASCO® Trade Dress serves no purpose apart from distinguishing McIlhenny's products from those of competitors, *see* Neuhaus Decl. ¶ 8, and its features "are clearly more aesthetic in nature than functional." *Pengu Swim Sch., LLC v. Blue Legend, LLC*, 21-CV-1525, 2023 WL 3044607, at *12 (S.D. Tex. Apr. 21, 2023) (citation and internal quotation marks omitted). Nothing about the combination of colors and shapes in the TABASCO® Trade Dress affects the cost or quality of McIlhenny's products. Neuhaus Decl. ¶ 9. In addition, "equally usable" designs exist for competitors to use, *Whirlpool*, 80 F.4th at 544, and hundreds of products compete with McIlhenny without copying the TABASCO® Trade Dress. *See* Neuhaus Decl. ¶ 9; *Whirlpool*, 80 F.4th at 544 ("[T]he presence of competing products with other design motifs cuts against [a finding of functionality]."). In other words, the TABASCO® Trade Dress covers "ornamental, incidental, or arbitrary" design elements and, therefore, is non-functional. *TrafFix*, 532 U.S. at 30.

In sum, the TABASCO® Trade Dress is valid and protectable.

## 2.   Defendants' Products Are Likely to Cause Confusion

In the Fifth Circuit, likelihood of confusion is assessed by considering several non-exhaustive elements, known as the "digits of confusion":

> (1) the type of mark infringed, (2) the similarity between the marks, (3) the similarity of the products, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, (7) evidence of actual confusion, and (8) the degree of care exercised by potential purchasers.

*Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280, 289 (5th Cir. 2020). "No single factor is dispositive, and a finding of a likelihood of confusion need not be supported by a majority of the factors." *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 453 (5th Cir. 2017) (citation omitted). Here, the digits of confusion weigh in McIlhenny's favor.

**a.   The TABASCO® Trade Dress is Strong.** "The type-of-mark digit refers to the strength of a mark." *Future Proof*, 982 F.3d at 290. "The stronger the mark, the greater the protection it receives because the greater the likelihood that consumers will confuse the junior user's use with that of the senior user." *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 201 (5th Cir. 1998). For this factor, courts weigh conceptual and commercial strength: the former concerns whether the mark is "classified as generic, descriptive, suggestive, or arbitrary and fanciful," whereas the latter concerns "the standing of the mark in the marketplace." *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 330 (5th Cir. 2008). With respect to commercial strength, "[m]arks may be strengthened [in the marketplace] by extensive advertising, length of time in business, public recognition, and uniqueness." *T-Mobile US, Inc. v. AIO Wireless LLC*, 991 F. Supp. 2d 888, 914 (S.D. Tex. 2014) (citation omitted) (alteration in original).

The TABASCO® Trade Dress is both conceptually and commercially strong. First, the arbitrary and unique combination of elements that comprise the TABASCO® Trade Dress stands

out in a crowded field of competitors, helping consumers to distinguish products bearing the trade dress. *See* Neuhaus Decl. ¶¶ 8-9. Second, McIlhenny has exclusive ownership rights to use the TABASCO® Trade Dress and has used it for nearly one hundred years, *see id.* ¶ 9, which is a testament to its enduring strength. *See Smack Apparel*, 550 F.3d at 479 (holding that plaintiff's marks, which had "been used for over one hundred years," were "strong"). As discussed above, McIlhenny has engaged in extensive advertising and has enjoyed tremendous commercial success. *See* Neuhaus Decl. ¶¶ 10, 21-23.[2] As a result, the TABASCO® Trade Dress has become famous. *See id.* ¶¶ 29-32.

The strength of the TABASCO® Trade Dress heavily favors McIlhenny.

**b.  The Parties' Trade Dresses Are Almost Identical.** "The Fifth Circuit uses a 'subjective eyeball test' to determine whether two marks are similar." *T-Mobile*, 991 F. Supp. 2d at 921 (quoting *Exxon Corp. v. Tex. Motor Exch. of Hou., Inc.*, 628 F.2d 500, 504 (5th Cir. 1980)). In particular, courts consider how consumers perceive the parties' respective marks in the marketplace, focusing particularly on how the parties advertise their marks. *See Elvis Presley Enters.*, 141 F.3d at 197.

The entire color scheme and overall design of the Infringing Trade Dress – the clear bottle, the green plastic cap, the green label wrapping around the bottle neck, and the white, red, and green label featuring concentric circles – is virtually identical to the TABASCO® Trade Dress. *See*

---

[2] Courts in the Fifth Circuit have held that other marks are strong and entered preliminary injunctions based on far less evidence of commercial success. *See, e.g.*, *Quantum Fitness Corp. v. Quantum LifeStyle Ctrs., L.L.C.*, 83 F. Supp. 2d 810, 819-20 (S.D. Tex. 1999) (advertising expenses of over $1 million in ten years, distribution of over 100,000 promotional brochures, and reports in local and national publications); *Bd. of Regents of the Univ. of Hou. Sys. v. Hou. Coll. of Law, Inc.*, 214 F. Supp. 3d 573, 585-86 (S.D. Tex. 2016) (marketing expenses of over $500,000 annually, 80 years of use, multiple incontestable federal trademark registrations, and press coverage about plaintiff's services).

*RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*, 655 F. Supp. 2d 679, 701 (S.D. Tex. 2009) (finding the parties' trade dresses to be similar because they exhibited "the same color schemes and virtually identical placement and arrangement of the colors").

The similarity of the parties' respective trade dresses is even more pronounced when placed "in the context that a customer perceives them in the marketplace, which includes their presentation in advertisements." *Elvis Presley Enters.*, 141 F.3d at 197. Like many of McIlhenny's advertisements featuring the TABASCO® Trade Dress, Defendants' advertisements feature the Infringing Trade Dress alongside Bloody Marys or other savory cocktails and red chili peppers. *See* Neuhaus Decl. ¶ 49. Not surprisingly, the similarity of the parties' advertising is not lost on consumers, with Instagram users commenting on one of Defendants' social media posts: "This looks like Tabasco 🤣 🤣 🤣"; "Tabasco copy?"; and "As if a Stolichnaya took a Tabasco sauce" (translated from Spanish to English). *See id.* ¶ 44.

The similarity of the trade dresses weighs heavily in favor of McIlhenny.

**c. The Relevant Products Are Identical.** "The greater the similarity between the products . . . , the greater the likelihood of confusion." *Exxon*, 628 F.2d at 505. When the products at issue are not competing, courts consider whether "junior user's [products] are in a market that is one into which the senior user would naturally expand." *Elvis Presley Enters.*, 141 F.3d at 202.

McIlhenny has licensed the TABASCO® Trade Dress for use with alcoholic beverages, such as the ABSOLUT x TABASCO Brand Product, Neuhaus Decl. ¶¶ 24-26, and Defendants' Product is essentially identical to – and directly competes with – these licensed products, therefore increasing the likelihood of confusion. Although McIlhenny primarily sells hot sauce and licenses the TABASCO® Trade Dress in connection with many products other than vodka, "this is not enough to overcome . . . the identical nature of the products which directly compete." *Denbra IP*

*Holdings, LLC v. Thornton*, 521 F. Supp. 3d 677, 687 (E.D. Tex. Feb. 22, 2021)); *see also VIP Prods. LLC v. Jack Daniel's Props. Inc.*, 14-CV-2057 (SMM), 2025 WL 275909, at *9 (D. Ariz. Jan. 23, 2025) ("[A]lthough Jack Daniel's is primarily a producer and seller of whiskey, the consuming public observes Jack Daniel's trademarks and trade dress on a wide variety of merchandise . . . due to an extensive and long-running licensing program," which included dog products that were "related" to infringer's dog toys.).[3] Moreover, TABASCO® Brand Pepper Sauce has been a common ingredient in Bloody Mary cocktails for decades, and expanding from hot sauce to flavored alcoholic beverages, which McIlhenny has already done, is commonplace in the industry. Neuhaus Decl. ¶ 34. The similarity of the products at issue therefore weighs in McIlhenny's favor.

  **d.  The Parties Have Overlapping Trade and Marketing Channels.** The trade and marketing channel factors – which consider identity of retail outlets, purchasers, and advertising media – also favor McIlhenny. The parties' products are sold by many of the same retailers and are offered to many of the same consumers. *See Id.* ¶¶ 50-52. Both parties' products are available for sale in many of the same national supermarkets, convenience stores, and liquor stores, and they are marketed to the same consumers, namely, purchasers of spiced products, which include individual purchasers as well as restaurant and bar operators. *Id.* ¶¶ 50-51. With respect to

---

[3] Even if some consumers are not familiar with the officially licensed alcoholic beverages bearing the TABASCO® Trade Dress, consumers are accustomed to seeing a wide variety of other officially licensed, non-hot sauce products. Neuhaus Decl. ¶¶ 25, 27. Moreover, "[b]oth [alcoholic beverages and hot sauce] are consumable." *Gruma Corp. v. Mexican Rests., Inc.*, 497 F. App'x 392, 398 (5th Cir. 2012) (quoting *Beef/Eater Rests., Inc. v. James Burrough, Ltd.*, 398 F.2d 637, 639 (5th Cir. 1968)). Consumers reasonably could think that pepper-flavored vodka bearing the Infringing Trade Dress comes from the same source as TABASCO® Brand Pepper Sauce and the licensed products bearing the TABASCO® Trade Dress of which they are aware. *Id.* at 399 ("[C]onsumer perception controls.").

McIlhenny's co-branded alcohol products, including the ABSOLUT x TABASCO Brand Product, the parties' products are sold through the *same trade channels to the same consumers*. *Id.* ¶ 52.

The parties' marketing channels also overlap. Both parties' marketing materials highlight their respective products' connection to Louisiana, and both parties target consumers of hot sauce and spirits throughout the United States. *See id.* ¶ 49. In addition, the parties market their products using the same social media platforms. *See id.* ¶¶ 15-19, 44-46, 48; *Waterloo Sparkling Water Corp. v. Treaty Oak Brewing & Distilling Co.*, 21-CV-0161 (RP), 2021 WL 5568159, at *8 (W.D. Tex. Nov. 28, 2021) ("Promoting a product on social media, even if it is a common advertising platform, tends to support, rather than detract from, a finding of identity of advertising media.") (citing *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 229 (5th Cir. 2009)). These factors weigh heavily in McIlhenny's favor.

e. **Defendants Acted with Bad Faith Intent.** This "inquiry focuses on whether the defendant intended to derive benefits from the reputation of the plaintiff." *Streamline*, 851 F.3d at 455 (citation omitted). Bad faith "normally involves the imitation of packaging material, . . . adopting of similar distribution methods or other efforts by a party to 'pass off' its product as that of another." *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir. 1980) (citation omitted). Moreover, use "with 'knowledge' of the senior user's mark 'may give rise to a presumption that the defendant intended to cause public confusion.'" *Streamline*, 851 F.3d at 455-56 (quoting *Scott Fetzer Co.*, 381 F.3d at 486).

Here, Defendants intentionally selected the Infringing Trade Dress to benefit from McIlhenny's reputation. The parties' 2024 discussions and the fact that the Infringing Trade Dress is nearly identical the mockup provided to McIlhenny confirm Defendants' prior knowledge of the TABASCO® Trade Dress. *See* Neuhaus Decl. ¶ 53. In circumstances like these, courts frequently

infer wrongful intent based on "previous contractual or business relations between the parties." *Sun-Fun Prods., Inc. v. Suntan Rsch. & Dev. Inc.*, 656 F.2d 186, 189 (5th Cir. 1981).[4] *See* Neuhaus Decl. ¶¶ 35-36, 38-39. The resulting similarity between the parties' respective trade dresses is sufficient to conclude that Defendants intended to copy the TABASCO® Trade Dress. *See Lady Primrose's*, 2000 WL 309967, at *4 (concluding that the parties' trade dresses were "so strikingly similar . . . that we can only infer an intent to copy"); *Precision Tune, Inc. v. Tune-A-Car, Inc.*, 611 F. Supp. 360, 366 (W.D. La. 1984) (finding that defendant intended to copy plaintiff's trade dress because "the level of similarity in the two designs seems too high to be the product of coincidence"). Furthermore, Defendants' use of the Infringing Trade Dress after receiving a cease-and-desist letter *and* after McIlhenny filed the Complaint, Neuhaus Decl. ¶¶ 45-46, 57-60 & Ex. L, further supports a finding of bad faith. *See Trojan Battery Co. v. Trojan EV, LLC*, 21-CV-3075, 2024 WL 1331783, at *26 (S.D. Tex. Mar. 28, 2024) (holding that infringing conduct "after receiving a cease and desist letter and being sued . . . is strong evidence of intent to deceive").

This factor weighs heavily in McIlhenny's favor. Indeed, while "[p]roof of the defendant's intent to benefit from the good reputation of the plaintiff's products is not required in order to establish infringement," intent *standing alone* can establish it. *Sueros Y Bebidas Rehidratantes, S.A. de D.V. v. Indus Enters., LLC*, 690 F. Supp. 3d 745, 757-58 (S.D. Tex. 2023) (citing *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 173 (5th Cir. 1986)). Such intent exists here.

---

[4] Although the Infringing Trade Dress differs slightly from the 2024 mockups (*e.g.*, the Infringing Trade Dress lacks the TABASCO® mark), *see* Neuhaus Decl. ¶ 42, these changes are *minimal* and do not absolve Defendants of their intentional copying. *Cf. Waterloo*, 2021 WL 5568159, at *8 (no bad faith where the defendants *drastically* "changed the design of [their] packaging after [the plaintiff] objected to the original packaging," but noting that the finding of no bad faith "might be different were the [ ] Defendants to have continued with their original packaging design").

**f. Consumers Exercise a Low Degree of Care.** The less care consumers exercise in purchasing the parties' products, the more likely consumers will be confused. "Where items are relatively inexpensive, a buyer may take less care in selecting the item, thereby increasing the risk of confusion." *Streamline*, 851 F.3d at 458 (quoting *Smack Apparel*, 550 F.3d at 483). Although Defendants' Product is not yet available for sale, Defendants' other flavored vodka products are inexpensive, priced at under $27 for a 750-milliliter bottle on Defendants' website. *See* Neuhaus Decl. ¶ 52. The ABSOLUT x TABASCO Brand Product is similarly priced, *see id.*, and hot sauce products bearing the TABASCO® Trade Dress retails for less, at under $6 for a five-ounce bottle. *See id.* ¶ 21. Inexpensive products such as these are "impulse" buys, and consumers are not likely to exercise a high degree of care when purchasing them. *See Sueros Y Bebidas Rehidratantes*, 690 F. Supp. 3d at 758 (finding a low degree of care in decisions to purchase "inexpensive beverages"); *Tapatio Foods, LLC v. Rodriguez*, 19-CV-0335 (DAD)(SKO), 2019 WL 6168416, at *3 (E.D. Cal. Nov. 20, 2019) (noting that "hot sauce is an inexpensive product likely to be an 'impulse' purchase by most consumers, which increases the likelihood of confusion"). This factor weighs heavily in McIlhenny's favor.

**g. Confusion Exists Despite Defendants' Lack of Sales.** Although highly probative of likelihood of confusion, "evidence of actual confusion is not necessary to a finding of likelihood of confusion." *Amstar*, 615 F.2d at 263. "[V]ery little proof" of actual confusion is necessary. *Xtreme Lashes*, 576 F.3d at 229. Indeed, "[e]ven if the anecdotes are minor and isolated, 'courts may not ignore competent evidence of actual confusion.'" *Savage Tavern, Inc. v. Signature Stag, LLC*, 589 F. Supp. 3d 624, 654 (N.D. Tex. 2022) (quoting *Xtreme Lashes*, 576 F.3d at 229). Defendants' Product is not yet available for sale, and marketing for it commenced less than seven weeks ago. Neuhaus Decl. ¶¶ 40, 50. Thus, there has been limited opportunity for actual confusion

to arise. Despite the lack of sales, the fact that potential consumers commenting on Defendants' social media posts for Defendants' Product have drawn parallels to the TABASCO® Trade Dress, *see id.* ¶ 44, suggests that average consumers are likely to be confused once Defendants' Product enters the marketplace. *See Elvis Presley Enters.*, 141 F.3d at 204 ("Infringement can be based upon confusion that creates initial consumer interest, even though no actual sale is finally completed as a result of the confusion."). This factor, too, weighs in McIlhenny's favor.

**h. Weighing the Digits.** All of the digits of confusion weigh heavily in McIlhenny's favor. Accordingly, there is a strong likelihood of confusion, and McIlhenny is likely to succeed in proving trade dress infringement and unfair competition under the Lanham Act and Louisiana law.

## B. <u>Dilution Claims</u>

"Dilution" is the "weakening of the ability of a mark to clearly and unmistakably distinguish the source of a product." *Firefly Digit. Inc. v. Google Inc.*, 817 F. Supp. 2d 846, 866 (W.D. La. 2011). To prevail on a dilution claim under the Lanham Act, a plaintiff must establish that it: (1) owns a famous and distinctive mark; (2) that the defendant has used the plaintiff's mark in a way that dilutes its mark through blurring or tarnishing; (3) that similarity between the parties' marks gives rise to an association between the marks; and (4) that the association is likely to impair the distinctiveness of the plaintiff's mark or harm the reputation of the plaintiff's mark. *See Nat'l Bus. Forms & Printing, Inc. v. Ford Motor Co.*, 671 F.3d 526, 536 (5th Cir. 2012); 15 U.S.C. § 1125(c).[5] Here, McIlhenny alleges dilution by "blurring," Complaint ¶ 61, which "involves a diminution in the uniqueness or individuality of a mark." *Scott Fetzer*, 381 F.3d at 489.

---

[5] The requirements for dilution under the Louisiana Anti-Dilution Statute, La. Rev. Stat. Ann. § 51:223.1, largely mirror those for dilution under the Lanham Act, except that "the Louisiana statute requires [only] distinctiveness, not fame." *Advantage Rent-A-Car, Inc. v. Enter. Rent-A-Car, Co.*, 238 F.3d 378, 381 (5th Cir. 2001); *but see AutoZone IP LLC v. Awad*, 17-CV-13107, 2018 WL 6591910, at *3 (E.D. La. Dec. 12, 2018) ("[T]he requirements for dilution under state law *are the*

Under the Lanham Act, a mark is deemed famous for purposes of dilution "if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). Factors to be considered in determining fame include: (1) the duration, extent, and geographic reach of advertising and publicity of the mark, whether by the owner or third parties; (2) the amount, volume, and geographic extent of sales of goods offered under the mark; (3) the extent of actual recognition of the mark; and (4) whether the mark is registered. *Id.* As discussed above, the TABASCO® Trade Dress is distinctive, and there is overwhelming evidence that it became famous long before Defendants started using the Infringing Trade Dress. First, McIlhenny has exclusive ownership rights to use the TABASCO® Trade Dress and has used it for nearly one hundred years. *See* Neuhaus Decl. ¶ 8. Second, McIlhenny has enjoyed enormous sales for products bearing the TABASCO® Trade Dress and has invested hundreds of millions of dollars on advertising such products. *See id.* ¶¶ 10, 21-22. Third, as borne out by market research used by McIlhenny in the ordinary course of its business, the TABASCO® Trade Dress has been instantly recognizable by consumers for decades. *See id.* ¶ 23. Fourth, McIlhenny owns numerous federal trademark registrations for the TABASCO® Trade Dress and elements thereof. *See id.* ¶ 33.

Moreover, the Infringing Trade Dress and the TABASCO® Trade Dress are sufficiently similar such that consumers will assume an association between the parties' respective trade dresses, thereby blurring the distinctiveness of the TABASCO® Trade Dress. The trade dresses are nearly identical and, as discussed above, potential consumers commenting on Defendants'

---

*same* as the requirements for dilution under the Lanham Act.") (emphasis added); *Pres. All. of New Orleans, Inc. v. Gressett*, 05-CV-1337 (HGB)(SS), 2005 WL 8173931, at *3 (E.D. La. May 9, 2005) ("[The case law] is not clear whether a showing of distinctiveness for the purposes of dilution [under Louisiana law] . . . requires a name or mark to be famous.").

social media posts have already drawn a connection between the Infringing Trade Dress and the TABASCO® Trade Dress. *See id.* ¶¶ 41, 44, 53; *Viahart, LLC v. Chickadee Bus. Sols., LLC*, 19-CV-0406 (JCB), 2021 WL 6333033, at *9 (E.D. Tex. July 2, 2021) (finding that "customers' interaction with Defendants' marketing, sale, and distribution of [products bearing marks similar to the plaintiff's marks] caused an association in their minds with [the plaintiff's] mark").

The association by consumers between the parties' trade dresses, which more consumers are bound to make the longer Defendants use the Infringing Trade Dress, blurs and diminishes the uniqueness of the TABASCO® Trade Dress. McIlhenny has licensed the TABASCO® Trade Dress to various third parties in connection with an array of different product offerings. *See* Neuhaus Decl. ¶¶ 24-27. Therefore, Defendants' blatant copying of the TABASCO® Trade Dress – without a license – is "almost certain to cause dilution by blurring" the uniqueness and individuality of officially licensed products bearing the TABASCO® Trade Dress. *Tex. Tech Univ. v. Spiegelberg*, 461 F. Supp. 2d 510, 524 (N.D. Tex. 2006) (holding that "circulation of unlicensed products bearing [the plaintiff's] marks will likely blur the uniqueness of officially licensed products" because, "[u]ndoubtedly, the sale of unlicensed products will result in diminished individuality of the officially licensed products").

McIlhenny is therefore likely to succeed in proving dilution by blurring.

## II.    <u>McIlhenny Will Suffer Irreparable Harm Absent an Injunction</u>

Defendants' conduct, if not enjoined, will cause McIlhenny irreparable harm. "Under the Lanham Act, a plaintiff seeking a preliminary injunction 'shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits.'" *Whirlpool*, 80 F.4th at 546 (quoting 15 U.S.C. § 1116). This is because, "'[w]hen a likelihood of confusion exists, the plaintiff's lack of control over the quality of the defendant's goods or services

constitutes an immediate and irreparable injury, regardless of the actual quality of those goods or services.'" *Mighty Mug, Inc. v. 28ceramics*, 22-CV-0100 (RP), 2022 WL 22870172, at *4 (W.D. Tex. Mar. 8, 2022) (quoting *Quantum Fitness*, 83 F. Supp. at 831). Irreparable harm also "include[s] loss of control of reputation, loss of trade, and loss of goodwill," because compensatory damages are difficult or impossible to calculate. *Denbra IP Holdings*, 521 F. Supp. 3d at 689 (citing *Emerald City Mgmt., L.L.C. v. Kahn*, 624 F. App'x 223, 224 (5th Cir. 2015)).

Beyond the statutory presumption, McIlhenny is suffering, and will continue to suffer, exactly the types of harms courts find irreparable: loss of control over the TABASCO® Trade Dress and the quality of goods bearing the trade dress. *See* Neuhaus Decl. ¶ 54-56. The harm to McIlhenny is also imminent, as Defendants' Product undercuts the exclusivity of the ABSOLUT x TABASCO Brand Product and will almost certainly result in a loss of sales once the parties' respective products hit the market. *See id.* ¶ 56. McIlhenny should not have to wait for this nearly certain loss of sales to materialize while Defendants harm McIlhenny's reputation amongst consumers. Moreover, the Infringing Trade Dress harms McIlhenny's relationship with existing and future licensing partners by depriving McIlhenny of control over its licensing of the TABASCO® Trade Dress. *See id.*; *Wearable Shoe Tree, LLC v. Does 1-601*, 24-CV-0334 (SDJ), 2024 WL 3317749, at *4 (E.D. Tex. July 3, 2024) (finding irreparable harm where the defendants' infringement deprived the plaintiff "of the ability to control use and licensing of the [its trademarks]"). The damage to McIlhenny's reputation and goodwill in the TABASCO® Trade Dress is incalculable.

## III.    The Irreparable Harm to McIlhenny Far Outweighs Any Harm to Defendants

The balance of hardships weighs heavily in favor of McIlhenny. As shown above, Defendants' use of the Infringing Trade Dress is causing irreparable harm to McIlhenny. On the

other side, an injunction would simply require Defendants to do something they should have done in the first place: use different packaging for their pepper-flavored vodka, which Defendants could have easily done given that they sell nearly ten varieties of flavored vodka bearing packaging that does not copy the TABASCO® Trade Dress. *See* Neuhaus Decl. ¶ 50.

Any "hardship" Defendants would suffer from changing the packaging of Defendants' Product is of Defendants' own making, and they cannot avoid the consequence of a problem caused by their own unlawful conduct. *See ADT, LLC v. Cap. Connect, Inc.*, 145 F. Supp. 3d 671, 700 (N.D. Tex. 2015) (concluding that, "if the injunction harms [the defendant] in its communities, it will be entirely due to its own actions violating the Lanham Act"). Although the parties engaged in discussions in late 2024 about collaborating on a vodka product, McIlhenny made the reasonable business decision to affirmatively terminate those discussions after learning that Stoli was in bankruptcy and deciding to go in a different direction. Neuhaus Decl. ¶ 38. One day later, Defendants sent McIlhenny mockups of their proposed co-branded vodka product. *Id.* ¶ 39. The parties never signed a confidentiality agreement or any other agreement, and as a result, McIlhenny did not make, and never would have made, a commitment not to develop any product with Defendants' competitors. *Id.* In any event, trademark law at all times prohibited Defendants from using the TABASCO® Trade Dress without McIlhenny's consent.

Moreover, Defendants' Product is not yet available for purchase by consumers, and it is unclear whether Defendants have even started manufacturing or selling the products, *id.* ¶¶ 47, 50, suggesting that redesigning the packaging of Defendants' Product would not be costly. *See Am. Rice, Inc. v. Ark. Rice Growers Coop. Ass'n*, 532 F. Supp. 1376, 1389 (S.D. Tex. 1982) (finding that the defendant's "loss will be somewhat small" because its "labels have not been in the market for a long time, have not been heavily promoted, and have not built up a strong following"). Even

if Defendants have invested significant resources producing, marketing, and/or selling Defendants'

Product such that complying with a preliminary injunction would impose substantial costs, these

costs do not tip the balance of hardships in Defendants' favor. *See Savage Tavern*, 589 F. Supp.

3d at 661 (concluding that "giving decisive, or even great, weight to the compliance costs" imposed

by an injunction would "wrong[ly]" incentivize the defendant to "infringe *a lot*" so that the balance

of equities would "tip in the [defendant's] favor").

## IV.    A Preliminary Injunction Would Serve the Public Interest

"The public interest is always served by requiring compliance with Congressional statutes

such as the Lanham Act and by enjoining the use of infringing marks." *ADT*, 145 F. Supp. 3d

at 700 (citations omitted). Because the public has an interest in "not being deceived," the public

interest favors an injunction. *Id.* at 700-01 (citing cases).

## CONCLUSION

All four *Realogy* factors weigh in favor of a preliminary injunction. McIlhenny has

demonstrated a substantial likelihood of success in proving that the TABASCO® Trade Dress is

valid (to the extent not established by its incontestable federal trademark registrations), distinctive

(same), and famous, and that Defendants' Infringing Trade Dress was copied from the

TABASCO® Trade Dress in a calculated manner that is likely to cause confusion and dilute its

distinctiveness. Defendants' unlawful conduct is causing and will continue to cause McIlhenny

irreparable harm in the form of loss of control over products bearing TABASCO® Trade Dress,

loss of reputation, loss of sales, and loss of the ability to control use and licensing of the

TABASCO® Trade Dress. The balance of hardships tips sharply in McIlhenny's favor, and any

hardship imposed on Defendants by an injunction would be the result of Defendants' own unlawful

conduct. Finally, requiring Defendants to comply with federal and Louisiana law serves the public

interest. Accordingly, the Court should preliminarily enjoin Defendants from using the Infringing

Trade Dress, or any trade dress confusingly similar to the TABASCO® Trade Dress, until trial or

other disposition of this action.

Dated:   January 29, 2026                          **JONES WALKER LLP**

                                        By:___/s/ Amy K. Anderson_____
                                          Amy K. Anderson
                                          Texas Bar. No. 24077064
                                          5960 Berkshire Ln, Floor 6
                                          Dallas, Texas 75225
                                          Tel:     (214) 459-9682
                                          Fax:     (713) 437-1810
                                          Email:  aanderson@joneswalker.com

                                          Mark Mintz
                                          Texas Bar No. 24124555
                                          811 Main Street, Suite 2900
                                          Houston, Texas 77002
                                          Tel:     (713) 437-1800
                                          Fax:     (713) 437-1810
                                          Email:  mmintz@joneswalker.com

                                                  and

                                          James D. Weinberger (PHV *forthcoming*)
                                          Parker C. Eudy (PHV *forthcoming*)
                                          FROSS ZELNICK LEHRMAN & ZISSU, P.C.
                                          151 West 42nd Street, 17th Floor
                                          New York, NY 10036
                                          Tel:     (212) 813-5900
                                          Fax:     (212)813-5901
                                          Email:  jweinberger@fzlz.com
                                                   peudy@fzlz.com

                                          ***Attorneys for McIlhenny Company***